THE STATE OF TEXAS V. J. A. WHITTENBURG ET AL

No. A-4281. Decided February 24, 1954.
Rehearing overruled March 31, 1954.
(265 S.W. 2d Series 569)

*Paul New,* County Attorney, of Plains, *Klett, Bean & Evans,* and *Robt. H. Bean,* of Lubbock, for petitioners.

The Court of Civil Appeals erred in holding that the percentage of payment of an oil payment determines the value of the reversionary interest in the fraction of production out of which the oil payment is payable, and in reversing the judgment of the trial court in its instruction for petitioner, and in its holding that the trial court was in error in rendering a personal judgment

against persons for taxes due on property that had never belongs to the parties taxed because the judgment rendered was upon oil payments which belonged to the defendants during its existence. State v. Quintana Petroleum Co., 134 Texas 179, 133 S.W. 2d 1112; State v. Houser, 138 Texas 28, 156 S.W. 2d 968; State v. Mallett Land & Cattle Co., 126 Texas 392, 88 S.W. 2d 471.

*Sanders, Scott, Saunders & Smith* and *C. J. Humphrey, Adkins, Folley, Adkins, McConnell & Hankins,* all of Amarillo, for respondents.

In rebuttal of the points presented by petitioners cited: Whelan v. State, 252 S.W. 2d 271; Simkins v. City of Corsicana, 86 S.W. 2d 972; Dallas County v. Dallas National Bank, 142 Texas 439, 179 S.W. 2d 288.

MR. JUSTICE CALVERT delivered the opinion of the Court.

This suit was instituted by petitioner, the state of Texas, in behalf of itself, Yoakum County, and political subdivisions of the county, against respondents, J. A. Whittenburg, Jr., and others, for the collection of ad valorem taxes for the years 1942 to 1949 inclusive, alleged to be due and unpaid on account of respondents' ownership of mineral interests, referred to herein as oil payments, in three sections of land in Yoakum County. The trial court granted petitioner's motion for instructed verdict and rendered judgment for petitioner against respondents, J. A. Whittenburg, Jr., and Roy R. Whittenburg, as trustees of the J. A. Whittenburg Estate, for $20,229.70, against a number of respondents described as Geo. A. Whittenburg Heirs for $10,-038.72, and against several respondents described as beneficiaries of the Mattie Hedgecoke Estate for $1,428.80. A substantial part of the judgment is for penalties and interest.

The Court of Civil Appeals, holding that the evidence raises an issue or issues of fact as to the validity of the valuation and assessment of the oil payments, reversed the judgment of the trial court and remanded the cause. 259 S.W. 2d 270.

On July 20, 1937, J. A. Whittenburg, Jr., and Roy R. Whittenburg, executors of the estate of J. A. Whittenburg, and others of the respondents executed to Denver Producing and Refining Company as lessee two oil and gas leases, one of Surveys Nos. 831 and 863, and the other of Survey No. 830, Block D, John H. Gibson ,grantee, in Yoakum County. Each of the leases reserved to the lessors as free royalty the equal one-eighth part of all

oil produced and saved from the leased premises, and a one-eighth gas royalty; and each of the leases reserved also to the lessors an additional one-fourth of the minerals to be produced by the lessee, free of cost or expense to the lessors, and delivered to the credit of the lessors in the same manner as provided for delivery of the one-eighth royalty, "until lessors, their heirs, representatives and assigns shall have received from the net proceeds derived from the sale of said additional one-fourth interest reserved a sum of money equal to $1,250.00 per acre for each and every acre in the above described lease." Survey 830 being a school land section sold by the State with reservation of the minerals, the lease of that survey provided that the lessee should pay to the State of Texas its share of the consideration and make other payments in accordance with the requirements of the Relinquishment Act.

The valuation for taxation of the oil payment of $1,250.00 per acre, payable out of the one-fourth interest in the minerals, admittedly an interest in land and taxable as such, is the subject matter of the controversy herein. Oil was soon produced under the leases. The payments from production were regularly made and full payment of the $2,400,000 measuring and limiting the reservation of the one-fourth interest was completed early in 1949.

Of the $2,400,000 payable under the reservation, $2,000,000 was payable to the respondents. During the years 1938, 1939, 1940 and 1941, the respondents received the sum of $284,093.56, leaving unpaid and remaining due thereon the sum of $1,715,-906.44. The remaining unpaid portion of the oil payment, the percentage this portion bore to the whole payment, rounded to even figures, and the assessed valuation for each of the years on the oil payment and the reversion is shown in the following table:

|  | Unpaid Portion of Oil Payment | % of Whole Payment | Assessed Valuation | Assessed Valuation of Reversion |
|---|---|---|---|---|
| 1942 | $1,715,906.44 | 86% | $276,940.00 | $ 500.00 |
| 1943 | 1,639,618.13 | 82% | 264,800.00 | 500.00 |
| 1944 | 1,549,971.67 | 77% | 263,940.00 | 500.00 |
| 1945 | 1,372,229.92 | 69% | 279,080.00 | 500.00 |
| 1946 | 1,207,156.53 | 60% | 281,540.00 | 500.00 |
| 1947 | 1,029,688.12 | 51% | 294,580.00 | 40,000.00 |
| 1948 | 692,809.01 | 35% | 271,160.00 | 307,640.00 |
| 1949 | 150,898.13 | 7½% | 20,000.00 | 438,322.00 |

■ The State made a prima facie case of the validity of the assessed valuations by introduction in evidence of the official records. Article 7326, Vernon's Annotated Civil Statutes; State v. Republic Natural Gas Co., Tex. Civ. App., 181 S.W. 2d 592, writ ref. w.m. The burden then rested on the respondents, if they expected to prevail, to go forward with proof which would meet the requirements of law for avoiding the valuation. In discharge of this burden, respondents contented themselves with introduction of certain records highlighting comparative values placed on the unlimited 1/8 royalty owned by them and on the reversionary interest owned by the lessee in the 1/4 of production out of which the oil payment was to be made. They offered no testimony whatever as to the market value in the years involved of any of the three property interests—the oil payment, the reversionary interest in the 1/4 of production, or the unlimited 1/8 royalty. Neither did they offer any testimony of the market value of, or the value assessed by the Boards of Equalization on any other like property in the county.

Article VIII, Section 1 of the Constitution provides that "Taxation shall be equal and uniform" and that all property "shall be taxed in proportion to its value, which shall be ascertained as may be provided by law." By Article 7174, Revised Civil Statutes, 1925, the Legislature has directed that "real property shall be valued at its true and full value in money," and by Article 7212 has directed boards of equalization to hear evidence touching the "market value or true value" thereof. Our courts have interpreted these provisions to mean that assessed valuations shall be based on "the reasonable cash market value" of property. Rowland v. City of Tyler, Tex. Com. App., 5 S.W. 2d 756.

Since the courts of this state, in common with the courts of other jurisdictions, early recognized that exact uniformity and equality of taxation was unattainable, Rosenburg v. Weeks, 67 Texas 578, 4 S.W. 899, 901; Cooley on Taxation, 4th Edition, Vol. 1, § 259, they have sought through the years to lay down certain rules by which the force of an attack on assessed valuations, duly fixed by boards of equalization, may be measured.

■ It is now well settled that the assessment of property for tax purposes is a quasi-judicial function of boards of equalization and that no attack on valuations fixed by such boards can or will be sustained in the absence of proof or fraud, want of jurisdiction, illegality, or the adoption of an arbitrary and fundamentally erroneous plan or scheme of valuation. State v. Houser, 138

Texas 28, 156 S.W. 2d 968, 970-971; Druesdow v. Baker, Tex. Com. App., 229 S.W. 493, 495. Moreover, when their official action is attacked it will be presumed that such boards discharged their duties as public agencies according to law and acted in good faith. Zachry v. City of Uvalde, Tex. Com. App., 42 S.W. 2d 417; Lubbock Hotel Co. v. Lubbock Ind. Sch. Dist., Tex. Civ. App., 85 S.W. 2d 776, no writ; Hinkson v. Lorenzo Ind. Sch. Dist., Tex. Civ. App., 109 S.W. 2d 1008, writ dism.

■ While it has been held that a grossly excessive valuation may, in law, be sufficient to establish such fraud or illegality as to render a valuation void, Johnson v. Holland, 17 Texas Civ. App., 210, 43 S.W. 71, writ denied; City of Sweetwater v. Baird Development Co., Tex. Civ. App., 203 S.W. 801, no writ; Simkins v. City of Corsicana, Tex. Civ. App., 86 S.W. 2d 792, no writ; Howth v. French Ind. Sch. Dist., Tex. Civ. App., 115 S.W. 2d 1036; French Ind. Sch. Dist. v. Howth, 134 Texas 211, 134 S.W. 2d 1036, it is held with equal emphasis that mere errors in judgment or the fact that a trial judge of jury differs with the valuation fixed will not suffice as a basis for avoiding the board's action. Simkins v. City of Corsicana, supra; Druesdow v. Baker, supra; State v. Houser, supra.

■ If a valuation fixed by a board of equalization is attacked on the ground of unlawful or arbitrary discrimination, it is not sufficient to show, comparatively, that in other isolated instances, property of equal or greater value than that in suit, was valued at less, Dallas County v. Dallas Nat. Bank, 142 Texas 439, 179 S.W. 2d 288, or even that other property was omitted from the tax rolls altogether, Sam Bassett Lbr. Co. v. City of Houston, 145 Texas 492, 198 S.W. 2d 879; City of Wichita Falls v. J. J. & M. Taxman Ref. Co., Tex. Civ. App., 74 S.W. 2d 524, writ refused; Howth v. City of Beaumont, Tex. Civ. App., 118 S.W. 2d 350, no writ, except where the omission was the result of a deliberate and arbitrary plan or scheme to permit certain classes of property to escape their fair share of the tax burden, City of Houston v. Baker, Tex. Civ. App., 178 S.W. 820, writ refused. To prevail on the basis of unlawful discrimination it is not necessary that the taxpayer make a comparative showing with all other property in the county, Dallas County v. Dallas Nat. Bank, supra, but he must make at least a reasonable showing in that respect. Ibid.

■ When the attack is made because the board followed an arbitrary plan or scheme of fixing values, the taxpayer, to prevail, must show not only that the plan was an arbitrary and illegal

one but also that the use of the plan worked to his substantial injury. Druesdow v. Baker, supra; Rowland v. City of Tyler, Tex. Com. App., supra; Lubbock Hotel Co. v. Lubbock Ind. Sch. Dist., supra, page 778, where it is said: "A mere theory may not be litigated * * *. There must be more than the mere adoption of a fundamentally wrong principle or method of taxation. The courts grant relief upon 'the adoption of a fundamentally wrong principle or method, *the application of which substantially injures the complainant.*'"

The respondents have not contended on appeal that the valuations fixed by the Boards of Equalization on the oil payment were grossly in excess of the reasonable cash market value thereof in any year, as indeed they cannot, since there is in the record no evidence of such value. What they do contend is that (1) the Boards adopted and followed an arbitrary and fundamentally wrong plan or scheme of valuing their oil payment at substantially the same value as was placed on their unlimited royalty, failing and refusing to take into consideration the factor of the diminishing value of the oil payment, and (2) the Boards unlawfully discriminated against them by failing, from year to year, to lower the value on the oil payment and raise the value on the reversion.

Basic to both of the foregoing contentions is respondents' assertion that the Board failed and refused to follow this Court's opinion in State of Texas v. Quintana Petroleum Co., 134 Texas 179, 133 S.W. 2d 112, 117, 128 A.L.R. 843, interpreting that opinion to require, in cases like the instant one, that the valuation on the oil payment must be decreased and the valuation on the reversion increased each year as payments are made. The holding in the Quintana case was made in response to an expressed fear by the State that if such oil payments were held to be taxable the State would lose its right to taxes on the reversionary interest of the lessee during the years when the oil payment was paying out, a loss it could never recoup. The Court simply set this fear at rest. It was not said in that case that, regardless of other factors and considerations affecting reasonable cash market value, boards of equalization would be required each year to place a diminishing value on the oil payment and an increasing value on the reversionary interest. It was said only that, assuming continued production, the oil payment would become less valuable and the reversion more valuable as payments were made and that *"these facts must be taken into consideration"* in valuing such interests.

Apart from the single circumstance that the assessed valuation of the oil payment was not decreased and the assessed valuation of the reversion was not increased each year, a circumstance which, standing alone, would not raise a fact issue that the Board failed and refused to consider the factor mentioned in the Quintana case, there is no evidence in the record that the Board failed to consider it. On the contrary, the testimony of Bert Bartlett, a deputy tax assessor-collector during the years 1942, 1943, and 1944 and at the time of the trial is positive that the factor was considered along with a number of other factors such as amount of reserves, allowables, the price of oil and the length of time required for the oil payment to pay out. These factors were equally as important as the factor mentioned in the Quintana case in determining the reasonable cash market value of the oil payment and of the reversion, and under this record, which is devoid of proof, we have no way of now knowing whether the ultimate valuations fixed by the Board were illegal, arbitrary or discriminatory.

Irrespective of the absence of evidence to show failure by the Boards to consider the factor mentioned in the Quintana case, respondents nevertheless contend that the Board acted arbitrarily and illegally by assigning to the oil payment substantially the same value as was assigned to their commensurate unlimited royalty. They themselves admit that this was not true for some of the years involved, as, for instance, they say in their brief that in 1948 "the one-fourth oil payment was valued nearly 20% more than if it had been an unlimited royalty." It would be indeed a strange rule, the application of which would result in striking down the assessed valuations for the years 1942 to 1946, inclusive, when the value placed on the oil payment was substantially the same as the value placed on the unlimited royalty and would leave standing as valid the assessed valuation for 1948 when such value was fixed at 20% more than the unlimited royalty. But dealing alone with the years 1942-1946, a period during which the record does show that the oil payment was assessed at substantially the same figure as a commensurate unlimited royalty, the record is devoid of any proof of prejudice or injury to respondents.

Under the late decisions of the courts of this state, some of which are cited above, it is recognized that to obtain relief from a valuation fixed according to some arbitrary rule the taxpayer must show substantial injury. One of the latest cases on the subject is Montgomery County v. Humble Oil & Ref'g. Co., Tex. Civ. App., 245 S.W. 2d 326, 335. In that case proof on the trial

showed and the trial court found, that whereas the Board of Equalization had assessed all non-mineral property in Montgomery County at 10% of value it had arbitrarily assessed Humble's mineral properties at 33-1/3% of their value, as fixed by the Board's own witnesses at the hearing conducted by the Board. Humble sought and obtained from the trial court an injunction against collection of its taxes on the ground that the admittedly arbitrary nature of the assessment voided the same without the necessity of proof of injury. The trial court upheld this contention, declining to require that Humble make proof on the trial that the assessed valuation was in fact in excess of 10% of value and declining to permit the State to offer evidence that the valuation was not, in fact, in excess of 10% of the reasonable cash market value of the properties. The Court of Civil Appeals reversed the judgment and dissolved the injunction, holding that there could be no proof of injury in the absence of evidence that Humble's property was, in fact, valued at more than 10% of its market value, and saying: "We think the fact that in the hearing before the Board of Equalization there was no issue or contest over the proposed valuations of the mineral properties as being about one-third of the actual market value of the properties cannot be any reason for holding that in a suit for injunction Humble did not have the burden of showing that it had been injured by the acts of the Board complained of, and that such proposed valuation in fact was about one-third of the actual market value of its mineral property." While we stamped Humble's application for writ of error "Refused, no reversible error," the record reflects that the foregoing question was the only one presented in the application and we could not have refused it if we had not agreed that the burden rested on Humble to make proof of injury by offering evidence of market value and thereby showing that the value assessed on its properties was in excess of 10%. It is not perceived how any sound basis could exist for applying a different rule in a suit by the State for the collection of taxes.

Respondents offered no evidence in this case showing the respective market values of the oil payment and the unlimited royalty. It may well be that the unlimited royalty was grossly undervalued, in which event the arbitrary placing of the same value on the oil payment benefited rather than injured respondents.

Even if it were conceded that the assessment on the unlimited royalty was based on its market value and that the limited oil payment was, as a matter of law, substantially less valuable,

there would yet be lacking any proof of injury. While assessments are made against property and not against persons and boards of equalization are directed by Article 7174 to assess each property interest separately, judicial relief is granted only to persons to relieve them of unjust and disproportionate tax burdens that grow out of illegal and discriminatory assessments. A taxpayer cannot show that he has been subjected to discrimination by an arbitrary and illegal assessment, or that by virtue thereof he is being required to bear an unjust or disproportionate share of the tax burden, by proof that separate property interests of different market values owned by him are assessed at substantially the same value, or that separate property interests of equal market values owned by him are assessed at substantially different values. He can only make the necessary showing by proof that his property interests are assessed substantially higher than property interests of equal or greater market value owned by others. This is clearly the rule laid down in Missouri, K. & T. Ry. Co. of Texas v. Hassell, 57 Tex. Civ. App., 522, 123 S.W. 190, writ denied, cited with approval by the Supreme Court of the United States in Baker v. Druesedow, 263 U.S. 137, 44 Sup. Ct. 40, 68 L. Ed. 212.

Much of what has been said applies with equal force to the contention that the high valuation placed on the oil payment and the failure to lower it from year to year compared with the low valuation placed on the reversion and the failure to raise it from year to year establishes unlawful discrimination. Here, again, no testimony of the respective market values of the two property interests was offered. From the table set out above it will be noted that in January 1942, only 14% of the oil payment had been paid in the preceding four years. At that rate of payment it would have appeared to the Board, assuming continued production, that it would require 28½ years to discharge the full obligation, or 24½ years to discharge the balance then remaining unpaid. Reduced allowables or a drop in the price of oil would have lengthened the pay-out period. The estimated reserves may not have been such as to support a belief that the oil remaining at the end of the pay-out period would be of substantial value. Moreover, the owner of the reversionary interest had an investment on which it could expect no return of any character during the long pay-out period. In addition, the oil payment was to be delivered free of production costs and before the lessee could realize any return from the ¼ interest after it vested, it was first necessary that it recoup the cost of producing the oil payment. All of these were important factors in determining the market value of the reversionary interest in 1942, and for aught

we know all of them were considered by the Board of Equalization. All of them also existed, albeit in somewhat lesser degree, in 1943, 1944, 1945, and 1946. The testimony of Mr. Bartlett is that the Boards tried to ascertain the market value of the reversion and to place on it an assessed valuation at the same percentage used in assessing other property. There is no testimony that they did not do so.

■ Neither is there any proof of injury to respondents from the disparity in these values. The reversion may have been grossly undervalued. If it was, this fact alone would not entitle the respondents to have the assessed valuations placed on their oil payment declared void.

We think the Court of Civil Appeals was in error in holding on this record that respondents were entitled to go to the jury on the foregoing issues. We are also convinced that the Court erred in reversing the trial court's judgment on the other ground discussed in its opinion.

Petitioner sued a number of respondents as the heirs of George A. Whittenburg for the taxes levied against the interest in the oil payment owned by those heirs or by the George A. Whittenburg Estate, and sued several of the respondents as beneficiaries of the Mattie Hedgecoke Estate for the taxes levied against the interest in the oil payment owned by that estate, and personal judgment was rendered against the respondents, who are the heirs of George A. Whittenburg, jointly and severally, and personal judgment was rendered against the beneficiaries of the Mattie Hedgecoke Estate jointly and severally. Complaint is made that each of the heirs of George A. Whittenburg is or was the owner of only an undivided interest and not of the entire interest owned by all of the George A. Whittenburg heirs, and that each of the beneficiaries of the Mattie Hedgecoke Estate was the beneficiary of only an undivided interest, and that each should have been held responsible only for the tax on his undivided interest.

It seems that Bashara v. Saratoga Independent School District, 139 Texas 532, 163 S.W. 2d 631, would support this contention but for the fact that the assessments were made in the manner in which the property was rendered. The record shows that the interest or property jointly owned by the George A. Whittenburg heirs was rendered and assessed in the name of George A. Whittenburg heirs, and tax receipts show that payments were made by and for the George A. Whittenburg heirs of

the taxes on the surface and royalty owned by them and assessed is the same way against them as heirs. The same is true with respect to the rendition and assessment of the interest owned by the Mattie Hedgecoke Estate and of the receipt to that estate for the taxes in the year 1948 on its surface and royalty interests. It was stipulated by the parties and found by the trial court that the estate of Mattie Hedgecoke was distributed among the respondents who were sued as beneficiaries of that estate, and that the property so distributed to them had a value in excess of the taxes claimed against them.

In our opinion there was no error in rendering personal judgment jointly against the heirs of George A. Whittenburg for the taxes for the years 1942 to 1949 inclusive, and no error in rendering personal judgment jointly against the beneficiaries of the Mattie Hedgecoke Estate for the taxes for the year 1948. Denman v. State, Tex. Civ. App., 85 S.W. 2d 252; State Mortgage Corporation v. Ludwig, 121 Texas 268, 48 S.W. 2d 950; French Independent School District v. Howth, 134 Texas 211, 214, 215, 134 S.W. 2d 1036; Dallas Title & Trust Co. v. City of Oak Cliff, 8 Tex. Civ. App., 217, 27 S.W. 1036.

We have examined the other points of error which the respondents had before the Court of Civil Appeals and find no sufficient reason therein for reversal of the trial court's judgment. Accordingly the judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.

Opinion delivered February 24, 1954.

MR. JUSTICE SMEDLEY joined by JUSTICES BREWSTER and SMITH, dissenting.

I cannot agree with the opinion of the majority in its decision that there was a valid valuation of respondents' oil payment for taxes for the years 1942 to 1946, inclusive. I have carefully examined the entire record, and in my opinion it conclusively and unquestionably demonstrates that the valuations of the oil payment for those years were made by the taxing officials in accordance with an arbitrary and fundamentally unfair method or plan that discriminated against respondents, the owners of the property, and denied to them the equality and uniformity of taxation that is guaranteed by Section 1 of Article VIII of the Constitution of Texas. The district court should have granted respondents' motion for peremptory instruction in so far as it applied to the taxes for the years 1942 to 1946, and should have

rendered judgment denying petitioner's claim for taxes as assessed and levied for those years.

The facts as to the execution of the oil and gas leases by respondents on July 20, 1937, the reservation of the one-eighth royalty and the further reservation of an additional one-fourth of the minerals to be produced by the lessees, free of cost and expense to lessors, until the lessors should receive from the net proceeds derived from the sale of the additional one-fourth interest reserved a sum of money equal to $1,250.00 per acre are correctly stated in the opinion of the majority.

The production of oil was continuous and substantial before and during the period for which the taxes are sought to be collected. The undisputed evidence is that the land involved in this suit was considered to be "in about the best area in the country." Payments from production were regularly made and the full payment of the $2,400,000 measuring and limiting the reservation of the one-fourth interest was completed early in 1949. There was from the beginning of substantial production before 1942 a steady reduction each year of the amount of the balance remaining unpaid on the oil payment.

The well-founded complaint of respondents was and is that notwithstanding the steady reduction of the amount of the balance due on the oil payment and the consequent steady reduction of the value of the oil payment, the Board of Equalization in fixing the value of the oil payment for taxation used an arbitrary and discriminatory plan or method which wrongfully fixed the value as if it were an unlimited royalty; that the Board wrongfully and arbitrarily failed and refused to take into consideration the fact that the value of the oil payment was being steadily reduced each year, and failed and refused to make fair division of the value of the one-fourth reserved interest between the lessors and the lessee, and that the Board persistently and wrongfully refused to follow the rule for the valuing of such property as set out in State of Texas (O'Conner) v. Quintana Petroleum Company, 134 Texas 179, 133 S.W. 2d 112, 134 S.W. 2d 1016, 128 A.L.R. 843, all to respondents' prejudice and injury.

The county of Yoakum employed experts to make or recommend valuations of oil interests, and the valuations so made or recommended by them were adopted or used by the Tax Assessor and the Board of Equalization. For the years 1942 to 1946 inclusive the Board of Equalization, in valuing the leasehold or working interest of Denver Producing and Refining Company,

considered that interest as representing only a five-eighths mineral interest, deducting from the seven-eighths the one-fourth interest reserved for the oil payment, and it placed substantial values on the five-eighths interest, making no considerable changes in the values during the years 1942 to 1946. At the same time it placed during each of those years the nominal valuation of $500 on what is described in the assessment as a "reversion" or "equity," consisting of the right to receive "1/4 of 8/8 leasehold estate if and when $1,250 per acre has been fully paid out of the proceeds of a reserved interest of one-fourth of all the oil and gas." No change was made in the assessed value of the "reversion" or "equity" during the five years. It remained constant at $500.

During the same five years, 1942 to 1946, the assessor and the Board of Equalization valued the one-eighth royalty interest and also separately valued and assessed the one-fourth interest reserved to the lessors for the payment of the sum of $1,250 per acre. During those years the interest so reserved, the oil payment, was valued by the Board of Equalization as if it were an unlimited free royalty. For example, the one-eighth royalty on Sections 831 and 863 for the year 1942 was valued at $90,280, and the one-eighth oil payment assessed against the J. A. Whittenburg estate for that year was valued at $90,030. The same method of valuing the oil payment as if it were unlimited royalty was followed during the entire five-year period. This is shown by the exhibits giving the details of the valuations, to the correctness of which petitioner agreed. And in the course of the trial petitioner agreed and stipulated that during that period "the oil payments were taxed at substantially, at the same valuation as a commensurate royalty interest, with the exception of less $500 for the reversionary interest."

Of the total oil payment 85% remained unpaid in 1942, 82% in 1943, 77% in 1944, 68% in 1945, and 60% in 1946. And yet the Board of Equalization failed, and indeed refused, to take into consideration the constant reduction of the amount remaining unpaid. It continued in spite of that to place the same value on the oil payment that it placed on a commensurate royalty. And it continued to assess the lessee's "equity" or "reversion" at $500. Thus in relation to the royalty and in relation to the lessee's interest, more than its fair share of the value was imposed upon the oil payment. In so doing the Board of Equalization failed to take into consideration the fact that the interest or estate of the lessee had greater value on account of the limitation imposed upon the one-fourth interest reserved for the oil payment than

it would have had if the one-fourth interest had been reserved without limitation; and it failed to take into consideration the fact that, assuming continued production as there was here, the interest or estate of the lessee became more valuable each year as the time approached when all of the reserved one-fourth interest would vest in the lessee. And it failed to take into consideration the fact that the value of the oil payment decreased as the amount unpaid was reduced by the payments regularly made out of production. It is further shown by undisputed evidence that respondents each year protested against the method or plan used in valuing the property and that their protests were ignored.

All of the facts set out above are established by undisputed evidence.

It is settled by the decisions in this state that when the taxing officials employ an arbitrary and unjust method of valuing and assessing property, as was done here, the property owner is entitled to relief against the valuations and assessments. Lively v. Missouri, Kansas & Texas Ry. Co., 102 Texas 545, 120 S.W. 852; Simkins v. City of Corsicana, 86 S.W. 2d 792; Dallas National Bank v. Dallas County, 173 S.W. 2d 558, id. 142 Texas 439, 179 S.W. 2d 288; Whelan v. State, 252 S.W. 2d 271; State v. Richardson, 126 Texas 11, 84 S.W. 2d 1076; French Independent School District v. Howth, 134 Texas 211, 134 S.W. 2d 1036; State v. Houser, 138 Texas 28, 33, 156 S.W. 2d 968; Bashara v. Saratoga Independent School District, 139 Texas 532, 163 S.W. 2d 631.

Repeatedly in the opinion of the majority the fact is stressed that respondents offered no proof of the reasonable cash market value of the oil payment and no evidence that the valuations fixed by the Board were in excess of the reasonable cash market value. Indeed, that is the theme of the opinion, and seems to be the reason for the decision made. The view disregards the authorities cited above. It is true that respondents do not attack the valuations as being in excess of reasonable cash market value. That is not necessary when it is proved that the taxing officials used an arbitrary and fundamentally unfair and unjust method in arriving at the valuations, or when the valuations so made work discrimination against respondents or result in the imposition of more taxes than respondents would be required to pay had a fair method of valuation been used.

For example, in Lively v. Missouri, Kansas & Texas Ry. Co., 102 Texas 545, 120 S.W. 852, the law required that property be

valued for taxes at its full market value, and the State Tax Board had apportioned and certified to Dallas County its proportionate part of the value of the railway company's intangible assets, representing the full market value of the company's intangible assets in Dallas County, and the county officials approved the assessment so made on full value. These officials had valued and assessed the property of the people in the county at sixty-six and two-thirds per cent of its fair market value. In the railway company's successful suit to enjoin the collection of taxes as assessed against it the county authorities, among other grounds, defended on the ground that the railway company's property was not assessed beyond its true value. The court held that the assessment was invalid and should be reduced to the same proportion of value as was placed on the mass of property in the county. In so holding the court said: "The fact that appellee was not required to pay more than it should does not satisfy the constitutional right to have all others owning property in the same territory and subject to like taxation to bear their equal proportion of the burden of government. That is a substantial right that may be asserted and enforced in the courts." In that case the assessment was held to be invalid although it was on a valuation not in excess of true value, but on true value.

In the instant case facts were not developed to show that like oil interests in other properties than the land here involved were valued in amounts substantially less than the valuation placed on respondents' property. But there was discrimination as between respondents and the owner of another interest in the very property here involved, that is, as between respondents, the owners of the oil payment, and the owner of the leasehold interest. Respondents were charged for taxation with the full value of the one-fourth reserved for the oil payment, or the full value less the nominal sum of $500. The lessee was charged with practically nothing, that is, the nominal valuation of $500 on its so-called "reversion" or "equity." The assessed value of the "reversion" or "equity" remained at $500 through the years 1942 to 1946, although its value in proportion to that of the oil payment was obviously and necessarily increasing each year as the balance due on the oil payment was steadily being reduced. The result of the method thus arbitrarily used was that each year the lessee was required to pay less than it should have paid on its interest, and the respondents are required under the opinion of the majority to pay more on their interest than they should be required to pay. And this discrimination is made, not in valuing similar property, but in valuing interests owned in the very same property. It is thus more clearly discriminatory and unfair than

when comparisons are made of the valuations of similar but different property. For example, one owns an undivided three-fourths interest in property and another owns an undivided one-fourth interest in the same property. The one's interest is valued for taxation at $10,000, while the other's interest is valued at $10.00—a clear case of discrimination on account of which relief would be granted as a matter of course.

Similarly, in Dallas National Bank v. Dallas County, 173 S.W. 2d 558, 561, id. 142 Texas 439, 179 S.W. 2d 288, where there was illegal discrimination against the bank in the valuation of its property for taxation, the court rejected as a defense to the bank's suit to invalidate the assessment the contention of the county that the bank suffered no legal injury, in that its assessment, after all, was upon less than actual or market value.

In Simkins v. City of Corsicana, 86 S.W. 2d 792, 793, the court said: "If the Board acts arbitrarily or capriciously or applies wrong principles in ascertaining the true value, then such valuations may be set aside by the courts," citing authorities. In State of Texas v. Houser, 138 Texas 28, 33, 156 S. W.2d 968, the court's opinion, after the statement of the rule that if a board fairly and honestly endeavors to fix a just valuation for taxing purposes, the mistake on its part is not subject to review by the court, contains the following: "Of course if a board adopts a method that is illegal, arbitrary, or fundamentally wrong, or if the valuation is grossly excessive, the decision of such board may be attacked and set aside."

Here the method used by the Board in valuing respondents' property for taxation for the years 1942 to 1946 was illegal, arbitrary, and fundamentally wrong, and because such was the method used by the Board the Court of Civil Appeals correctly held that the assessment should be set aside.

The method used was fundamentally wrong because the record shows without dispute that during each of the five years the Board persisted in giving the oil payment the same value as if it were an unlimited royalty. In each of those years the oil payment was valued at twice the value placed on the one-eighth unlimited royalty, although the one-fourth interest reserved for the oil payment, because it was limited to the payment of the stated amount and would automatically terminate when full payment had been made, was necessarily of substantially less value than a commensurate unlimited royalty.

The method used was fundamentally unfair and wrong because the Board persisted in declining to reduce the valuation of the oil payment when its value was necessarily and steadily decreasing as the amount of the balance due steadily decreased. It must be remembered that during these five years the production was very substantial and continuous, and that the balance due was during the entire period being reduced by the payments regularly made.

The method used was fundamentally wrong and discriminatory because during the years 1942 to 1946 the Board continued to value the oil payment as if it were unlimited royalty and declined to reduce its valuation, although the balance due on the oil payment was steadily declining, and at the same time and during each of those years valued the lessee's interest in the reserved one-fourth, referred to as "reversion" or "equity," at the nominal sum of $500, and did not increase that valuation.

The method used was illegal and arbitrary because, although the rule given for the valuation of oil payments such as that here involved in State of Texas (O'Connor) v. Quintana Petroleum Company, 134 Texas 179, 133 S.W. 2d 112, 134 S.W. 2d 1016, 128 A.L.R. 843, 850, was called to the attention of the taxing officials, and they were urged to follow it, they failed and refused to follow it. Apparently, the taxing officials followed the decision of the Court of Civil Appeals in that case, the effect of which was to charge against the lessors, the respondents, for taxes the full value of the fractional interest reserved for the oil payment as if it were unlimited royalty, and without reducing the valuation as the balance due on the oil payment became less, and to charge none of the value of that reserved fractional interest save the nominal sum of $500 against the lessee. The rule set out in the Quintana case, 134 Texas 179, 189, 133 S.W. 2d 112, 117, is:

"It is apparent that, where there is substantial production, as here, the right to a part of the minerals as they are produced, subject to the limitation that the right ceases when a certain sum has been realized from the proceeds thereof, is not of as great value as would be the right to an equal part of the minerals not subject to limitation; and it is further apparent that the value of the lessor's right or interest so limited, assuming continued production, will decrease each year. *These facts must be taken into consideration in valuing such interest for taxation.* Likewise it is apparent that the leasehold estate under this lease has a greater value on account of the limitation imposed upon

the reserved 7/32 interest, with the provision that upon the termination of title under the reservation the 7/32 shall vest in the lessee, than it would have if the 7/32 interest had been reserved without limitation; and it is further apparent, still assuming continued production, that the leasehold estate will become more valuable each year as the time approaches when the 7/32 interest will vest in the lessee. *And these facts must be taken into consideration in valuing the leasehold estate for taxation.*" (Emphasis added.)

The opinion of the majority is in error in stating that there is no evidence in the record, save the amounts of the assessed valuations, that the Board refused to follow the rule of the Quintana case for valuing the oil payment. On the contrary, the record shows persistent and obstinate refusal on the part of the Board to follow it. As early as February 2, 1940, respondents wrote a letter to the tax collector of Yoakum County in which they referred to the fact that uncertainty had existed as to the correct method of valuing this property before this Court's decision of the Quintana case, pointed out that the owner of the leasehold interest had been relying on the opinion of the Court of Civil Appeals in that case, quoted at length from this Court's opinion in the Quintana case, and explained carefully that according to it the value of the interest reserved for the oil payment should be divided between the lessors and the lessee according to their respective interests. Following this letter some small adjustments were made in the valuations for the years 1938, 1939 and 1941, but it is thoroughly demonstrated by record evidence that the Board for the years 1942 to 1946 deliberately disregarded the rule thus called to their attention. They did not decrease the valuations placed on respondents' oil payment, and they left at the nominal sum of $500 the valuation of lessee's interest. The record also contains written protests made each year by respondents of the valuations placed on the oil payment. Further, Mr. Bartlett, deputy tax assessor and collector, testified that he attended meetings of the Board of Equalization during the hearings for the years 1942, 1943 and 1944, and that he knew that respondents continually pointed out from year to year that as the oil payment was paid off by virtue of production their interest in the oil payment became less valuable each year, and the lessee's interest became more valuable each year, and that the valuation of the oil payment should be reduced, but he said that he did not agree with the contention. Questioned whether representatives of respondents were present every year trying to get the Board to consider their position, Mr. Bartlett answered: "They were down here, and for a number of years we laughed

when we saw them coming—there comes the objectors again." Despite all of these protests the Board adhered to its arbitrary method of valuing the property, kept placing on the oil payment the same values that it placed on a commensurate unlimited royalty, and charged the whole value of the reserved one-fourth against respondents, except the paltry sum of $500 charged against the lessee.

To support its conclusion that there is no proof of the use by the taxing authorities of an arbitrary and unjust method in valuing the oil payment, the opinion of the majority refers to testimony of the deputy tax assessor and collector, Bert Bartlett, that several factors were used in arriving at the valuations, including the amount of reserves, allowable, the price of oil, etc. Such testimony was given by Mr. Bartlett in answer to leading questions, but the testimony was directed generally to the valuing of interests in oil producing properties instead of being directed specifically to the method of valuing the property here involved. Futhermore, that isolated testimony is not contradictory of what is apparent from the entire record, including Mr. Bartlett's testimony, as to the method by which the valuations of the interests here involved were made.

That method was this: The county employed experts, referred to as tax engineers, to investigate the oil producing properties and place values on the different interests in those properties. The experts made what Mr. Bartlett referred to as proposed values, to be submitted to the county officials, which were used by the county officials, save in exceptional instances. It was those experts who, in arriving at the values, took into consideration the various factors such as the number of producing wells and the other factors above referred to. Having made the investigation, the experts set a value on the seven-eighths working interest and a value on the one-eigth royalty interest, and then if they found that an interest had been taken out of the royalty or out of the working interest, they used for its value a proportionate part of the valuation of the royalty or of the working interest, giving consideration to the different terms of the overriding royalty or the oil payment contained in the instrument creating or retaining it. Bert Bartlett testified that if two different persons owned the one-eighth royalty, one-sixteenth being owned by each, the taxing officials took one-half of the value of the one-eighth royalty for the value of the one-sixteenth; that when an overriding royalty was found the same method was followed, using whatever fraction was owned, that is, taking the valuation that had been placed on the royalty interest, provided

the overriding royalty did not bear operating expenses. And he testified that the same method was used in valuing oil payments, and was used in this case, the Whittenburg case.

It is apparent from this testimony and from the record evidence showing the valuations each year of the royalty interest and of the oil payment that when the tax experts and the county taxing officials came to value the oil payment owned by respondents they found that it was payable out of a one-fourth mineral interest not charged with operating expenses, and accordingly they gave it the value that they had decided upon for unlimited royalty, and charged the whole of the one-fourth interest to respondents, and that they thus valued it each year from 1942 to 1946, never reducing it and never increasing the value of the lessee's "reversion" or "equity" in the reserved one-fourth.

The unfairness and illegality in the plan used do not consist in a failure to take various factors into consideration in the original valuation of the royalty interest. The tax engineers did take them into consideration in arriving at the valuation placed on the unlimited royalty interest. The illegality and unfairness are in the arbitrary use of the value of unlimited royalty in valuing the oil payment, in the refusal to reduce the valuation of the oil payment as the amount of the balance due on it was steadily reduced by payments, and in the arbitrary refusal to divide the value of the one-fourth interest between respondents and the lessee instead of charging all of it against respondents.

The opinion of the majority argues that even if an arbitrary and unfair method was used in valuing respondents' property they are entitled to no relief and must pay on that valuation because there is no proof that respondents have been injured by the use of such a method. This harks back to the repeated statement heretofore answered that respondents made no proof that the valuations exceeded the fair market value, and therefore have not shown that they are required by the judgment to pay more taxes than they should pay.

Furthermore, under the record before us respondents have been injured by the use of the arbitrary and unjust method. It clearly appears that if the taxing officials had followed a legal and fair method respondents would not have been subjected to the payment of taxes in such a great amount as that which the trial court's judgment imposes upon them. If the oil payment had been valued at less than the value of an unlimited royalty as it should have been, respondents' taxes would have been less.

If the valuation of the oil payment for taxes had been reduced each year as the balance due on its steadily became less each year, as it should have been reduced, respondents' taxes would have been less. If all of the one-fourth reserved for the oil payment had not been charged against respondents but fair division of its value had been made between respondents and the lessee, respondents' taxes would have been less.

Too much has been written, but there seems to be justification for it in the firm conviction that the record made proves conclusively the arbitrary use of an illegal and fundamentally wrong method in valuing respondents' property for taxation for the years 1942 to 1946 inclusive.

A judgment declaring invalid the valuations and assessments made for the years 1942 to 1946 inclusive and denying to petitioner a recovery of taxes, interest and penalty on the basis of those valuations need not deprive petitioner of taxes on the property for those years, for the judgment could be rendered without prejudice to the right of petitioner to make a proper and fair revaluation and reassessment and collect taxes thereon.

I do not dissent from the part of the majority opinion which holds valid the valuations and assessments for the years 1947, 1948 and 1949, for the record does not show that the Board in valuing the oil payment for those years followed the arbitrary method that it used for the years 1942 to 1946. It did not during the three later years place the same values on the oil payment that it gave to like fractional interests of royalty, and it did not give to the lessee's "equity" or "reversion" the mere nominal value of $500. The valuations, or some of the valuations, for the years 1947 to 1949 are excessive when compared to the values given to the unlimited royalty, and they, or at least some of them, are in amounts out of proportion to the values given to the lessee's "equity" or "reversion," when consideration is given to the percentages of the oil payment remaining unpaid. Such differences, however, are not clearly shown to have been caused by the use of a plan that is arbitrary or fundamentally wrong. The valuations for those years may be sustained as valid under such decisions as Victory v. State, 138 Texas 285, 158 S.W. 2d 760; State of Texas v. Houser, 138 Texas 28, 156 S.W. 2d 968; Zachry v. City of Uvalde, (Com. App.) 42 S.W. 2d 417; and Lubbock Hotel Co. v. Lubbock Independent School District, 85 S.W. 2d 776.

Opinion delivered February 24, 1954.

Rehearing overruled March 31, 1954.