Donald D. SHARP and Walter Wruck, Appellants,

v.

SINTON INDEPENDENT SCHOOL DISTRICT, Appellee.

No. 13–84–066–CV.

Court of Appeals of Texas, Corpus Christi.

April 18, 1985.

Rehearing Denied June 18, 1985.

Peter J. O'Loughlin, Jones & O'Loughlin, Houston, for appellants.

Kent M. Rider, Joseph & Rider, Dale Linebarger, Calame, Linebarger & Graham, Austin, for appellee.

## OPINION

PER CURIAM.

This is a suit for delinquent taxes brought by the school district seeking back taxes, penalties, and interest from the les-

sees/operators of an oil and gas lease. The court, sitting without a jury, entered a judgment awarding the taxing authority $10,480.62 for the years 1976 through 1979. Findings of fact and conclusions of law were filed by the trial court.

Appellants owned undivided, equal shares of a seven-eighths interest in the minerals from the Walter Hartzell property in San Patricio County. Their lease covered 40 acres; production was from wells, B–1, B–5 and B–6. These wells had been drilled in the 1950's by prior operators, but were either plugged or abandoned in the early 1960's because it was not economically feasible to continue producing the wells. When Sharp acquired the oil and gas mineral lease on the Hartzell tract on November 30, 1974, there was no production.

### B–6

Appellants drilled the plug out of the abandoned B–6 well in mid 1975, making a completion that resulted in a producing gas well; however, approximately the second month of production, lack of pressure in B–6 resulted in inability to enter the transmission line without use of a compressor.

Appellants installed a single-stage compressor, but it was inadequate. In December 1975, a two-stage compressor was installed which boosted the wellhead pressure over the 1,000 psi line pressure of Lo-Vaca so that gas could be delivered for sale. The single-stage compressor cost $945.00 per month; the two-stage compressor cost $2,089.00 per month, with a minimum six-month commitment.

With the compressor, B–6 provided a "big" production month in December 1975, but then produced for just three or four months longer, with a decline in deliveries. The B–6 well watered out in May 1976.

### B–5

The next well appellants tried to produce from was the B–5. This re-entry was made in late 1975. It was a low pressure well, also necessitating the use of a two-stage compressor. B–5 was classified as an oil well with a high gas ratio. Production

lasted only about eleven months at an average of two to three barrels per day.

### B–1

Appellants re-entered B–1 in December of 1975. They discovered the well would have to be pumped, but did not have funds for the equipment until 1977. B–1, an oil well, made about six to eight barrels of oil per day and three hundred barrels of water. Production lasted about a year at that rate.

For the years 1975 through 1980, the job of appraising minerals for taxation was contracted out by the school district to the firm of Pritchard & Abbott (P & A), who recommended values to the district's tax assessor to be accepted or rejected. The Pritchard & Abbott appraisal values for these years on each well were summarized in plaintiff's Exhibit 19 as follows:

| Well | 1976 | 1977 | 1978 | 1979 |
|------|------|------|------|------|
| B–6 | 459,820 | 5,450 | 5,450 | 8,170 |
| B–5 | 0 | 65,280 | 6,860 | 10,290 |
| B–1 | 0 | 6,890 | 46,730 | 27,880 |
| | 459,820 | 77,620 | 59,040 | 46,340 |

In summary form, the opinions of value and 100% appraisal values actually used appear below:

| | 1976 | 1977 | 1978 | 1979 |
|------|------|------|------|------|
| P&A | 459,820 | 77,620 | 59,040 | 46,340 |
| S.I.S.D. | | | | |
| Hartzell et al | 459,833 | 70,730 | 12,317 | 18,467 |
| Hartzell "B" | 0 | 6,890 | 42,067 | 43,517 |
| | 459,833 | 77,620 | 54,384 | 61,984 |
| Sharp | 15,000 | 5,000 | 0 | 0 |

In their first three points of error, appellants allege the trial court erred in concluding that the appraised values used by the Sinton Independent School District for taxing the Hartzell lease for 1976, 1977, 1978 and 1979 were not grossly excessive when compared to the market values of the lease for each of those years. Appellants complain that the court's findings and conclusions were erroneous because there was (1) no evidence to support them, (2) the evidence was factually insufficient to support them and (3) the findings and conclusions were against the great weight and preponderance of the evidence.

■ Appellants' claim of gross excessiveness is an affirmative defense. *Hays Consolidated Independent School District v. Valero Transmission Co.,* 645 S.W.2d 542, 547–49 (Tex.App.—Austin 1982, writ ref'd n.r.e.). It was appellants' burden to secure findings to support this defense, and the proper points of error complaining of the trial court's failure to do so are that the defense was established as a matter of law or that the court's failure to find the assessments grossly excessive was against the great weight and preponderance of the evidence. *See* In re King's Estate, 244 S.W.2d 660 (Tex.1951) and Calvert, *No Evidence and Insufficient Evidence Points of Error,* 38 Tex.L.Rev. 361 (1961).

■ In reviewing the evidence to support the court's judgment and the appellants' claims, we begin with the rule that property should be assessed at its value as of January 1st and that circumstances developing or taking place subsequent to January 1st cannot be considered. *Lo–Vaca Gathering Co. v. Matagorda County,* 664 S.W.2d 802, 804 (Tex.App.—Corpus Christi 1984, no writ). Thus, the fact that a well ceased to produce later in a tax year can have no bearing on the value of that well on January 1st of the tax year. The relevant inquiry would be whether it was clearly and reasonably foreseeable on January 1st that a well would cease to produce. *Id.* at 805.

To show that the school district's appraisal of B–6 was grossly excessive, appellants sought to establish that on January 1, 1976, the well had only a short life expectancy because it produced from a very small reservoir.

Appellants established that the well had been plugged and abandoned by a prior operator. The plug was drilled out, and B–6 produced for two months, in July and August of 1975. July production was approximately eight million cubic feet of gas; production dropped off to approximately seven point eight million cubic feet within a thirty-day period. The single-stage compressor was installed, then the two-stage compressor, and total production for 1975 amounted to approximately twenty-five million cubic feet of gas.

As taken from plaintiff's Exhibit 18, monthly production as reported to the Texas Railroad Commission in 1975 for B–6 was as follows:

B–6 Production in Million Cubic Feet

| | |
|---|---|
| July | 8.082 |
| August | 7.820 |
| September | 1.004 |
| October | 0.218 |
| November | 0.270 |
| December | 7.330 |

In arriving at the fair market value of well B–6 as of January 1, 1976, the P&A evaluator considered only December production. Committee guidelines were that valuation would be based on the last three months of production, "unless that didn't seem proper." On this point, the following colloquy occurred between counsel for defendants and plaintiff's expert witness:

Q: What is your interpretation of why the last three months of production in 1975 weren't used on page one of Plaintiff's Exhibit 18 instead of just the last one month?

A: I don't have an interpretation other than that's what the appraiser thought was more representative to develop the value.

Q: Do you have an interpretation why the appraiser might have thought the last month is more representative?

A: No.

As previously stated, the life of the well was important in determining the fair market value of B–6. On the P&A work-up sheet appears the number "932" for payout in days. Plaintiff's expert testified that this represented a 10% yearly decline for eight years; however, he was unable to state whether 10% was the figure actually used in fixing reserves, and he was unable to state why this number was chosen. Plaintiff's expert answered, "I doubt it" to an inquiry whether electric logs were considered by Pritchard & Abbot in fixing reserves of 441 million cubic feet of gas in the zone tapped by B–6. He then stated

that reserves were not determined by P&A from sand thickness and acreage.

To further establish their defense of a grossly excessive valuation, appellants point out that they acquired an exemption from the Railroad Commission's requirement of periodic shut-in testing of wellhead pressure. These exemptions are granted to wells of such low pressure that they may fill with water or condensate and die if tested. Appellant Sharp stated he filed for the exemption in November of 1975.

Finally, we note that appellants paid $20.00 per acre bonus for the lease and ⅛ royalty. For their $800.00, they acquired the mineral interest in a tract that had been explored by six wells, but abandoned by two prior operators.

■ However primitive the method, scheme, or plan the appraisal district used might be characterized by appellants, the method per se is not illegal. However, the evidence clearly shows and we find that the plan was not itself followed, or as it was applied to the B–6 mineral based valuation for 1976, that it created a grossly excessive valuation.

The evidence clearly leads us to the inescapable conclusion that the lease valuation for 1976 (B–6) was on December, 1975 production only when the appraiser's guidelines called for the last three months of the year "unless that didn't seem proper." The December production figure was over 27 times that of November and 33 times greater than October. There was no accounting, explanation, or reasonable basis shown for the non-use of the last three months.

Plaintiff's own witness could not explain or account for the exclusive use of the December figure nor could he account for the 10% yearly decline on 8 year revenue estimates used. There may have been other reasons for the use of the December production only (i.e. why the basis of valuation would "not seem proper" over the last three months of 1975), but they were not presented to the court. There did exist prior to January 1, 1976 as was shown by the evidence factors that might clearly or reasonably foreshadow the wells' reduction of production or cessation of production.

We observe that the valuation (based on December 1975 production alone) actually used by the school district was more than 2.8 times the valuation (based on the mean average) that would have resulted had the district used and followed its own scheme or method of basing valuation on the last three months of 1975. While not binding on the court, the only other presentation of the market value was presented by the plaintiff and is substantially less (30 times) than that found by the trial court. Thus, under the circumstances of the case, the trial court's conclusions that the valuation placed on well B–6 for the 1976 tax year was not grossly excessive and would not result in substantial injury to appellants were against the great weight and preponderance of the evidence.

In light of the evidence set out above, we agree with appellants that the Sinton Independent School District's appraisal of nearly $460,000.00 as the fair market value in 1976 of the 40 acre Hartzell mineral interest was grossly excessive. The trial court's failure to so find is against the great weight and preponderance of the evidence and appellant's third point of error is sustained. We, therefore, reverse that portion of the judgment that awards $7,689.57 for taxes due and owing in 1976.

Appellants have attacked all the tax appraisals as grossly excessive. It is, therefore, necessary to consider the evidence to support the judgment for the years 1977, 1978 and 1979.

At the outset, we note that B–6, responsible for the bulk of production and most of the taxes, watered out in 1976 and was taxed only for equipment value in the years 1977–1979.

### 1977

■ The 1977 Assessment consists of four elements: (1) equipment value of $5,450.00 for B–6, (2) equipment value of $6,890.00 for B–1, (3) equipment value of $6,860.00 for B–5, and (4) mineral value of

$58,420.00 for B–5. Thus, the dispute is basically over the appraisal of the minerals.

We have reviewed the evidence and are not convinced that the school district's assessment is grossly excessive as a matter of law or that the court's conclusion that such was not grossly excessive is based on insufficient evidence or against the great weight and preponderance of the evidence. The assessment was based on a payout of one year for the gas and a year and a half for the oil, and production rates were based on the average daily production rate for the last three months of 1976 for oil and the month of December for gas. December's gas production did not vary significantly from the two prior months.

#### 1978–79

■ The dispute for these years is again directed to mineral valuation, only this time the well responsible for production was B–1. B–5 and B–6 were appraised at salvage value. B–1 mineral production was valued by P&A at $39,840.00 as of January 1, 1978, and $17,500.00 as of January 1, 1979.

Again, we have reviewed the evidence, and we cannot say that the school district's appraisal is grossly excessive as a matter of law or that the trial court's finding that such was not grossly excessive is based on insufficient evidence or against the great weight and preponderance of the evidence. Production rates were estimated from averages of prior months, and operating costs and reserve decline were considered. We also note that the school district's appraisal was lower in both years than that suggested to it by P&A.

■ Appellants' fourth point of error is a complaint that misdescription of the property resulted in two tax statements for certain years. Appellants allege "this double listing clearly makes for inability to identify."

Sinton Independent School District issued tax statements for two properties: Hartzell, et al and Hartzell "B." The school district assessed B–6 and B–5 as Hartzell, et al, and B–1 as Hartzell "B."

In *City of Corpus Christi v. Davis*, 575 S.W.2d 46, 55–56 (Tex.Civ.App.—Corpus Christi 1978, no writ) this Court noted that requirements for a description to be considered sufficient to support a valid tax assessment are different from the requirements of the description to support a valid lien proceeding, and wrote: "If the inadequate description, together with the taxpayer's own knowledge, makes known to him the property that is being assessed, it is said that he is not misled." *Id* at 56.

Sharp testified that the 40-acre lease was the only property he owned in the county, thus, it should have been clear to him what interest the district sought to tax. Although it may have been better to have assessed each well individually, and by number, we conclude that appellants were not misled. Appellants' fourth point of error is overruled.

■ Appellants' fifth, sixth and seventh points of error are presented as a combined point of error attacking the failure of the court to find the taxing scheme discriminatory.

In the instant case, the judgment is against Sharp and Wruck, jointly and severally. At trial, the school district introduced evidence to show that Wruck owned other property in San Patricio County. There was no evidence concerning the value of this property.

In *Commissioners Court of Anderson County v. Calhoon*, 575 S.W.2d 72 (Tex. Civ.App.—Tyler 1978, no writ), the court wrote: "Where the tax plan is attacked on the ground of inequality of assessment, proof of the actual market value of *all* of the plaintiff's property subject to the challenged plan is necessary, since without such proof no discrimination is established." *Id.* at 75.

In *State v. Whittenburg*, 153 Tex. 205, 265 S.W.2d 569 (1954) the Supreme Court wrote:

"To prevail on the basis of unlawful discrimination, it is not necessary that the taxpayer make a comparative showing with all other property in the county

..., but he must make at least a reasonable showing in that respect."

*Id.* 265 S.W.2d at 573. Also:

"[The taxpayer] can only make the necessary showing by proof that his property interests are assessed substantially higher than property interests of equal or greater market value owned by others."

*Id.* 265 S.W.2d at 575. In the instant case, appellants made no showing that their property was assessed substantially higher than that of others. Because the record is devoid of any such evidence, appellants' fifth, sixth, and seventh points of error are overruled.

■■■ In their eighth point of error appellants allege:

"The District Court erred in its findings ... on cash fair market value, since the requirement is that the Findings of Fact state such value without qualification on such dates."

Findings of Facts 6, 8, 10 and 12 differed only in dates and amounts. Number 6 is representative:

"6. *Based upon conditions known to exist* as of January 1, 1976, the market value of the Hartzell lease was $459,820.00."

Appellants apparently complain of the emphasized portion of the finding, contending it should not have been included. We disagree. Tax assessments should be based on known conditions or those reasonably foreseeable. *See Lo–Vaca Gathering Co. v. Matagorda County.* Appellants' eighth point of error is overruled.

Appellants' ninth point of error complains of the trial court's failure to make appellants' amended and additional findings of fact and conclusions of law. Appellants argue that, because of the aforementioned "qualifications" in the trial court's findings as discussed in point of error eight, there are no findings on the actual cash fair market value of the property on the appraisal dates. We disagree that there are no findings on fair market value, and having overruled appellant's eighth

point of error, we also overrule their ninth point.

■■■ In their tenth point of error, appellants allege that the trial court erred in excluding defendants' Exhibits 6, 7 and 8. These documentary exhibits are before this Court as a supplemental transcript. Appellee argues that appellants failed to preserve error because no bill of exceptions was made. The statement of facts reflects that the documents although excluded were presented to the court and the parties; therefore, we will consider appellants' point of error. No "formal" bill of exceptions was necessary. *Guynn v. Corpus Christi Bank of Trust,* 589 S.W.2d 764, 772–73 (Tex.Civ.App.—Corpus Christi 1979, writ dism'd).

Exhibits 6 and 7 were joint operation statements reflecting costs for the operation on the lease from August of 1975 through December 9, 1979. Exhibit 8 was a summary of production revenue. Though the Court refused to admit these exhibits, appellant Sharp was allowed to testify that there was very little, if any, net profit. He stated there was a rough profit of $10,000.00 the first year, then $1,900.00, and losses in 1978 and 1979. He also was allowed to testify that the profit, if any, was from B–6 and that B–1 and B–5 resulted in a break even or a loss.

■■■ We conclude that even if the court erred in excluding appellants' Exhibits 6, 7 and 8, then the error, if any, was harmless. The exclusion of cumulative evidence is not reversible error. *Reina v. General Accident Fire and Life Assurance Corp.,* 611 S.W.2d 415, 417 (Tex.1981); *First State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696, 704 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). Appellants' tenth point of error is overruled.

That portion of the judgment of the trial court awarding $7,689.57 for taxes, penalty, interest and cost due and owing for the year 1976 is REVERSED, and the cause is REMANDED for retrial; that portion of the judgment awarding taxes, penalties, in-

terest and costs for the delinquent years 1977, 1978 and 1979 is AFFIRMED.

Upon retrial of the 1976 B–6 mineral valuation, we direct the trial court's attention to the instructions given by the Supreme Court in *Whelan v. State,* 155 Tex. 14, 282 S.W.2d 378 (1955) at p. 385.

## OPINION ON MOTION FOR REHEARING

██ Appellee's motion for rehearing was filed on May 2, 1985. In the motion for rehearing, appellee complains of the assessment of costs. This Court agrees that the costs should be retaxed. Appellee should have no costs adjudged against it because it is exempt. Tex.Tax Code Ann. § 33.49. (Vernon 1982). *See also City of Corpus Christi v. Davis,* 575 S.W.2d 46 (Tex.Civ.App.—Corpus Christi 1978, no writ). No costs are adjudged against appellee. Twenty percent are adjudged against appellant. The motion for rehearing is granted as to this point and the remainder is overruled.

The motion for rehearing is GRANTED in part and OVERRULED in part.