**D. E. WHELAN et al., Appellants,**

**v.**

**The STATE of Texas et al., Appellees.**

No. 6738.

Court of Civil Appeals of Texas.

Texarkana.

July 1, 1954.

Rehearing Denied Sept. 9, 1954.

See, also, 254 S.W.2d 558.

Dibrell, Gardner, Dotson & Graham, Sam J. Dotson, San Antonio, John E. Taylor, Marshall, Morton Taylor, Sinton, for appellants.

Shirley W. Peters, Dallas, C. M. Turlington, Marshall, for appellees.

HALL, Chief Justice.

This is a tax suit instituted by the State of Texas and Harrison County, for itself and the Harleton Common School District No. 18, against appellants for the collection of certain taxes assessed against their gas property for the years 1950, 1951 and 1952, and to foreclose tax lien against same. As stated in appellants' brief: "Defendants (appellants) answered with general denial, that the assessments were in violation of the Constitutions of the State of Texas and of the United States in that they were discriminatory and based upon fundamentally wrong methods of taxation."

The case was tried to a jury upon seventy-two special issues with the directive by the trial court that if the jury answered special issues one, two and three "no" they need not answer any other issue. The jury answered special issues one, two, and three "no." Upon these answers judgment was rendered for appellees for the taxes alleged to be due, together with penalty and interest and a foreclosure of tax lien on their property.

Appellants' first point is: "The trial court erred in overruling defendants' motion for judgment notwithstanding the verdict of the jury for the reason that it was established as a matter of law that the boards of equalization for each of the years 1950, 1951 and 1952, designedly, systematically and arbitrarily adopted and used a fixed and systematic policy of assessing for taxing purposes non-producing oil and gas leases of at least 200,000 acres at a flat value of $1.00 per acre, whereas said property had a fair value of from $5.00 to $200.00 per acre; and in assessing all cattle, 35,000 head in 1950, 40,000 head in 1951 and 50,000 head in 1952, at a flat value of $15.00 per head regardless of the true market or real value of said property, thereby depriving Harrison County and the

State of Texas and other taxing units, plaintiffs in this case, of a substantial amount of taxes and substantially increasing the tax burden on the defendants and their property in violation of Section 1, Article 8 of the Constitution of Texas and Section 1 of the Fourteenth Amendment to the Constitution of the United States." By point two appellants assert that the method of assessing non-producing oil and gas lands at $1 per acre and assessing all cattle at the flat rate of $15 per head employed by the equalization board of Harrison County, hereinafter referred to as the board, as set out in point one, is contrary to Section 1, Article 8 of the Texas Constitution, Vernon's Ann.St. and of Section 1 of the Fourteenth Amendment of the Federal Constitution. By their point two-a, appellants assert that such arbitrary assessment by the board of cattle and non-producing oil and gas leases at a flat rate, regardless of their actual cash value, while appellants' property was assessed at thirty per cent of its value renders the assessment against appellants' property null and void. And by points three and four appellants assert (a) there was no evidence to support the jury's negative answer to special issue No. 1 and (b) that the jury's answer to said special issue was against the overwhelming preponderance of the evidence. These points will be considered and discussed together.

In our opinion these points raise the principal issues on this appeal.

The facts reveal that appellants own and operate certain gas wells in northwest Harrison County in what is known as the Whelan Gas Field. Their gas wells are capable of producing gas and distillate from both the Travis Peak and Rodessa formations. Appellants introduced testimony to the effect that the board assessed all non-productive oil and gas leases without regard to their location at a flat rate of $1 per acre for the years 1950, 1951 and 1952, the years covered by this suit, and assessed all cattle in the county at $15 per head. The facts show further that there were about 200,000 acres of non-

productive oil and gas leases rendered in Harrison County during the years covered by this suit, the major portion of which was assessed at $1 per acre. Some of this acreage was assessed at less than $1 during some of the years in controversy and some at a larger figure. The same holds true with respect to the assessed value of the cattle. The facts also show that Harrison County during those years employed the engineering firm of King, Latham and Stults to aid and assist the board in fixing the valuation of the numerous gas and oil wells in the county for taxing purposes. Mr. Stults of that firm seems to have done most of the work in this regard, and he personally aided the board in fixing the value of the several producing wells in the different fields. His qualification as a petroleum engineer was admitted. This witness testified that the valuation he placed on appellants' producing gas wells was fair and equitable and was on the same basis as that recommended for the Stanolind and Hollandsworth producing wells in the Woodlawn Field, also in Harrison County, several miles to the east of the Whelan Field. There is substantial evidence that all producing oil and gas properties in Harrison County were assessed by the board at thirty to thirty-three per cent of its cash market value. In 1950 the total assessed value on the tax rolls of the 180,519 acres of non-producing oil and gas leases was $199,255.00; in 1951 the total assessed value of 210,100 acres of non-producing oil and gas leases was $215,678.00; and in 1952 the total assessed value of the 292,138 acres of non-producing oil and gas leases was $233,641.00.

The assessed value of appellants' property filed by them with the assessor-collector, together with the assessed value of said property fixed by the equalization board for the three years in controversy, is set out below. The property is listed on each of said inventories of the appellants and on each of said tax rolls. Following each item of property is the value placed on same by the appellants and followed by the values assessed against said property by the board:

| Lot or Block | Acres | 1950 | | 1951 | | 1952 | |
|---|---|---|---|---|---|---|---|
| | | Whelan (1) | County (2) | Whelan (3) | County (4) | Whelan (5) | County (6) |
| A. H. Peal et al Producing Gas Well | 96.5 | $22,000.00 | $ 98,490 | $16,500.00 | $87,790 | $11,000.00 | $67,030 |
| J. L. Ledbetter et al Unit Producing Gas Well | 704 | 30,000.00 | 170,370 | 22,500.00 | 96,430 | 15,000.00 | 94,730 |
| Dee & E. K. Knox Unit Producing Gas Well | 319.31 | 25,000.00 | 96,160 | 18,500.00 | 88,130 | 12,000.00 | 78,930 |
| Della Hughes et al Producing Gas Well | 352.42 | 20,000.00 | 81,390 | 15,000.00 | 68,840 | 10,000.00 | 61,010 |
| Crocket et al Unit Producing Gas Well | 548.57 | 10,000.00 | 26,550 | 7,500.00 | 32,870 | 5,000.00 | 28,020 |
| Newman et al Unit Producing Gas Well | 703.58 | 10,000.00 | 30,040 | 7,500.00 | 38,840 | 5,000.00 | 44,370 |
| Warehouse | 8 | 750.00 | | 600.00 | | 500.00 | 530 |
| Meterhouse | 2 | 100.00 | | 100.00 | | 100.00 | 100 |
| 100 Acres Fee Land Producing in Ledbetter Unit | 100 | 750.00 | 2,400 | 917.00 | 1,750 | 610.00 | 1,520 |
| Mineral Interest Producing under Knox Unit | 10 | 100.00 | 500 | | | | |
| Fractional Interest—⅜ of 46.55 acres Producing under Placid Oil Co. Dee & E. K. Nox Unit | 17.46 | Royalty Acres | 530 | 175.00 | 300 | 115.00 | 230 |
| Mineral Interest Producing Under Peal Well | 36 | 360.00 | 520 | | | | |
| Mineral Interest in Dunn Unit No. 2 | | 260.00 | | | | | |
| Fractional Interest—⅜ of 119.5 acres Producing under Placid Oil Co.—British-American No. 1 Peal | 44.81 | Royalty Acres | | 448.00 | 1,570 | 300.00 | 1,440 |
| A. H. Peal et al Fee Lands Fractional Interest—⅜ of 40 acres Producing under Placid Oil Co.—Dee Knox Unit | 15 | Royalty Acres | | 150.00 | 980 | 100.00 | 700 |
| A. H. Peal et al Fee Lands Fractional Interest—⅜ of 96.5 acres Producing under D. E. & R. J. Whelan No. 1 Peal | 36.19 | Royalty Acres | | 362.00 | 2,030 | 240.00 | 3,160 |
| D. Little Fee Lands Fractional Interest—¼ of 103 acres Producing under Placid Oil Co.—Dunn No. 2 | 25.75 | Royalty Acres | | 257.00 | 530 | 170.00 | 500 |
| A. H. Peal et al Fee Lands Fractional interest—⅜ of 110.59 acres Producing under R. Lacy, Inc.—No. 1 Peal | 41.47 | Royalty Acres | | 415.00 | 2,320 | 275.00 | 2,460 |
| A. H. Peal et al Fee Lands Fractional Interest—⅜ of 160 acres Producing under D. E. & R. J. Whelan Peal No. 1—A | 60 | Royalty Acres | | 600.00 | 2,540 | 400.00 | 2,120 |

| Lot or Block | Acres | 1950 | | 1951 | | 1952 | |
|---|---|---|---|---|---|---|---|
| | | Whelan (1) | County (2) | Whelan (3) | County (4) | Whelan (5) | County (6) |
| B. Andrews | 18.3 | $ 18.30 | | $ 18.30 | | $ 18.30 | |
| H. H. Barron | 11.88 | 11.88 | | 11.88 | | 11.88 | |
| E. E. Griffith | 40 | 40.00 | | 40.00 | | 40.00 | |
| Harleton Rural High School | 9.4 | 9.40 | | 9.40 | | 9.40 | |
| J. E. Hale et al | 45.8 | 45.80 | | 45.80 | | 45.80 | |
| D. McAllister et al | 96.50 | 96.50 | | 96.50 | | 96.50 | |
| Ora Hampton | 18.3 | 18.30 | | 18.30 | | 18.30 | |
| M. L. Knox et al | 59 | 59.00 | | 59.00 | | 59.00 | |
| M. L. Knox et al | 63 | 63.00 | | 63.00 | | 63.00 | |
| Mary E. Little | 87 | 87.00 | | 87.00 | | 87.00 | |
| Effie Lindsay | 18.3 | 18.30 | | 18.30 | | 18.30 | |
| Hugh Lane et al | 188 | 188.00 | | 188.00 | | 188.00 | |
| A. G. Maloney | 18.3 | 18.30 | | 18.30 | | 18.30 | |
| B. S. Newman et al | 45.8 | 45.80 | | 45.80 | | 45.80 | |
| B. S. Newman | 6.25 | 6.25 | | 6.25 | | 6.25 | |
| Belle Oney et al | 65 | 65.00 | | 65.00 | | 65.00 | |
| M. Perkins et al | 60 | 60.00 | | 60.00 | | 60.00 | |
| Helen Ragon | 18.3 | 18.30 | | 18.30 | | 18.30 | |
| Ross Ragon | 18.3 | 18.30 | | 18.30 | | 18.30 | |
| S. B. Ragon et al | 86.00 | 86.00 | | 86.00 | | 86.00 | |
| T. C. Starr | 50 | 50.00 | | 50.00 | | 50.00 | |
| Anna Wilson et al | 10.16 | 10.16 | | 10.16 | | 10.16 | |
| P. O. Beard et al | 50 | 50.00 | | 50.00 | | 50.00 | |
| 6.25 Acs. J. E. Newman Lease | 6.25 | 6.25 | | 6.25 | | 6.25 | |
| 100 Acs. Mineral Interest, B. Parker Survey Non-Producing | 100 | 100.00 | | 100.00 | | 100.00 | |
| Pipe Line, Gathering System and Dehydration Plant | | 12,360.00 | 27,780 | 10,000.00 | 22,200 | 6,500.00 | 22,200 |
| Ford Pick-up | | 400.00 | | 300.00 | 450 | 300.00 | 450 |
| Ford Tudor Sedan | | 400.00 | | 300.00 | 450 | 300.00 | 450 |
| Office Furniture & Fixtures | | 600.00 | | 450.00 | | 300.00 | 450 |
| Cash on hand—$2,212.57—60% | | 1,327.54 | | | | | |
| Cash on hand—$5,294.18—60% | | | | 8,176.50 | | | |
| Cash on hand—$3,587.20—60% | | | | | | 3,304.32 | |
| Gasoline Stripping Plant | | 15,000.00 | 29,000 | 11,250.00 | 23,250.00 | 7,500.00 | 23,200 |

Article 8, § 1 of our State Constitution provides that: "Taxation shall be equal and uniform" and "all property in this State * * * shall be taxed in proportion to its value, which shall be ascertained as may be provided by law." The Fourteenth Amendment of the United States Constitution provides for equal protection of the law to all citizens. Appellants insist that the method employed by the board in assessing appellants' gas properties for taxes and that used in assessing other properties in Harrison County violate the above provisions of the state and federal constitutions. Especially do they contend that the plan adopted by the board with respect to assessing unproductive oil and gas leases at $1 per acre and of cattle at $15 per head is vicious and renders the assessment by the board of their gas producing properties void. In the recent case of the State v. Whittenburg, Tex.Sup., 265 S.W.2d 569, 573, it is said: "When the attack is made because the board followed an arbitrary plan or scheme of fixing values, the taxpayer, to prevail, must show not only that the plan was an arbitrary and illegal one but also that the use of the plan worked to his *substantial injury*", citing cases. (Italics ours.) The record reveals without dispute that all of appellants' non-producing oil and gas leases amounting to about 1190 acres were assessed by them at the flat rate of $1 per acre and that such assessment was not disturbed by the board. In such circumstances it is our opinion that appellants, having used the $1 per acre plan or scheme adopted by the board (if it were so adopted) for assessing their non-producing oil and gas leases, are in no position to show injury, and, if it be conceded that the plan or scheme was illegal, they having applied it to their non-producing acreage and profited by it are in no position to challenge such arrangement. "He can. only make the necessary showing by proof that his property interests are assessed substantially higher than property interests of equal or greater market value owned by others." State v. Whittenburg, supra, and authorities cited.

The record also reveals that cattle in Harrison County were assessed generally at about $15 per head. There were some few that were assessed at a larger sum. But assuming that the cattle in the county were assessed at $15 per head or less, which included cattle of all classes and ages, as expressed by one witness, as big, little, old, young and scrubs, this item amounted to a little over one per cent of the total valuation of the property of said county, and in our opinion is not sufficient to overturn the verdict of the jury in finding that appellants' property for the three years in controversy was not assessed at a substantially higher per cent of its true value than was fixed by the board on the great bulk of the property on the assessment rolls of Harrison County.

Specifically, appellants' complaint is that their property was assessed at a higher value than the non-productive oil and gas leases in the county (heretofore disposed of), the cattle of the county, the Charles Cobb estate, the Hollandsworth lease of 3333 acres in the Woodlawn Field, Stanolind Oil & Gas Company's productive leases in the Woodlawn Field, and the cash deposited with the banks and loan companies in the county. It is our opinion that the assessment of cattle, the Cobb estate and the Hollandsworth leases (during its unproductive period) form isolated items in the overall assessment of the property in the county. No complaint is made with respect to the assessment of the great amount of real estate and personal property throughout the county except as noted above. Granting that these isolated items were under-valued, there is, in our opinion, ample testimony here that they do not show a *substantial injury* to appellants, as required by State v. Whittenburg, supra; Dallas County v. Dallas National Bank, 142 Tex. 439, 179 S.W.2d 288. It has been held since an early date by the Supreme Court of this State as well as in the latest pronouncement on the subject that "exact uniformity of taxation is almost unattainable." Rosenburg v. Weekes, 67 Tex. 578, 4 S.W. 899, 901; State v. Whittenburg, su-

pra, and that: "That mere errors in judgment or the fact that a trial judge or jury differs with the valuation fixed will not suffice as a basis for avoiding the board's action." State v. Whittenburg, supra; Simkins v. City of Corsicana, Tex.Civ.App., 86 S.W.2d 792; Druesdow v. Baker, Tex. Com.App., 229 S.W. 493; State v. Houser, 138 Tex. 28, 156 S.W.2d 968. It is also held in State v. Whittenburg, supra, " 'A mere theory may not be litigated. * * * there must be more than the mere adoption of a fundamentally wrong principle or method of taxation. The courts grant relief upon "the adoption of a fundamentally wrong principle or method, *the application* *of which substantially injures the complainants."* * * *" State v. Whittenburg, supra. See also Dallas County v. Dallas National Bank, supra.

The principal contest here is with respect to the claim of disparity between the assessed valuation of the Stanolind producing properties in the Woodlawn Field and appellants' producing properties in the Whelan Field. The following exhibit, prepared by appellants' engineers, shows the sand thickness in the two producing zones, the effective sand section, calculated reserves and liquid barrels of distillate per million cubic feet under appellants' gas wells and the Stanolind wells in the Woodlawn Field:

(A) Sand Thickness:
    (1) Defendants' (Appellants') Properties;
        (a) Travis Peak Sand, (Hurst Report, Table 5, Plaintiffs' Exhibit No. 17)..........127 ft.
        (b) Rodessa Sand, (Smith Report, page 3, Plaintiffs' Exhibit No. 21)..............24.5 ft.
           Average Sand Thickness under Defendants' (Appellants') Properties...........151.5 ft.
    (2) Woodlawn Field; (Spooner Report, Exhibit 82)........................................19.77 ft.
        (Spooner Report, Exhibit 81)........................................................18.45 ft.
    (3) Stanolind Properties—
        Woodlawn Field (Exhibit 82).........................................................22.04 ft.
    (4) Hollandsworth Well—
        Woodlawn Field (Exhibit 82)..........................................................6.64 ft.

(B) Effective Sand Section:
    (1) Defendants' (Appellants') Properties:
        (a) Travis Peak Sand, (Hurst Report, p. 12, Plaintiffs' Exhibit 17)...... 1,077,642 ac. ft.
        (b) Rodessa Sand, (Smith Report, p. 2, Plaintiffs' Exhibit 21)......... 138,417 ac. ft.
        Total Effective Sand Section Under Defendants' (Appellants') properties 1,226,059 ac. ft.
    (2) Woodlawn Field (Spooner Report, Defendants' Exhibit 82, p. 12)......... 332,546 ac. ft.

(C) Calculated Reserves:
    (1) Whelan Field;
        (a) Travis Peak Sand (Hurst Report, p. 12 Plaintiffs' Exhibit 17)...... 711,700,000,000 cu. ft.
        (b) Rodessa Sand (Smith Report, Plaintiffs' Exhibit 21)................ 21,111,495,000 cu. ft.
        Total calculated Reserves Whelan Field.................................. 732,811,495,000 cu. ft.
    (2) Woodlawn Field, (Spooner Report, Page 12, Defendants' Exhibit 82)..... 267,311,000,000 cu. ft.

(D) Liquids, Bbls. Per Million Feet:
    (1) Defendants' Properties:
        (a) Travis Peak Sand, (Hurst Report, Plaintiffs' Exhibit 17)......... 16
        (b) Rodessa Sand (Smith Report, Plaintiffs' Exhibit 20).............. 5
    (2) Woodlawn Field (Sol Smith, S.F., p. 454)................................ 37

In fixing the taxable value of appellants' gas producing property as well as all like property in the county all parties to this suit employed and used extensively the services of highly trained petroleum engineers before the board. It would have been impossible for the board to establish with any degree of certainty, without the aid of experts, the actual taxable value of this species of property. The method used by the different oil and gas companies and the board has been held to be a proper one in establishing the value of oil and gas in place. "Minerals in place are matters concerning which the ordinary person probably knows little as to their value, and their value is usually a matter for expert testimony to explain to the jury, because not capable of being understood by the average person." Thorn v. Dunn, Tex. Civ.App., 94 S.W.2d 1229, 1230. The same engineers who aided the board and different oil and gas companies in establishing the taxable value of the various oil and gas properties in the county were before the trial court and jury and testified in much detail as to the value of the oil and gas in place in the several oil and gas fields in the county. Some of this testimony was highly conflicting as respected the value of the gas in place under appellants' gas wells, as well as under the wells of other gas

producers. This disputed issue became a jury question. There is substantial testimony supporting the answers returned by the jury to the first three issues. Furthermore, it is now a rule of law in this state that boards of equalization are quasi judicial bodies and their findings are presumed to be correct. In Victory v. State, 138 Tex. 285, 158 S.W.2d 760, 765, it is said: " 'All presumptions of law are in favor of the validity of the acts of the Commissioners' court. Hannon v. Henson, 15 S.W.2d 579, 584, by the Commission of Appeals, says: "All presumptions must be indulged in favor of the authority of the court to act at the time it did act, under the facts presented and under the circumstances shown." ' Anderson v. Parsley, Tex.Civ. App., 37 S.W.2d 358, loc. cit. 362, writ of error refused. * * * In order to set aside the findings of the board of equalization it is necessary to show either that the board had not jurisdiction, Ward County v. Wentz, Tex.Civ.App., 69 S.W.2d 571; City of El Paso v. Howze, Tex.Civ.App., 248 S.W. 99, writ of error refused, or that the board acted unlawfully to the prejudice of the complainant. Zachary v. City of Uvalde, Tex.Com.App., 42 S.W.2d 417." The burden then rested with appellants to show a wrongful action by the board in assessing their gas property at the figure it did, before the trial court would be authorized in setting the assessment aside. The jury saw fit to believe appellees' experts with regard to the valuation of appellants' gas properties as well as the valuation of all other oil and gas properties in the county. This was within its peculiar province and its finding should stand.

Appellants also seek to avoid paying the taxes assessed against their gas properties for the further reason that some 15 million dollars in cash on deposit in the several banks and loan companies in the county was not rendered by the owners for taxes with the assessor-collector. We do not think such failure on the part of other property owners to render their cash on deposit in the several banks and loan companies furnishes grounds for appellants' refusal to pay the taxes legally assessed against them. This question was before the court in City of Wichita Falls v. J. J. and M. Taxman Refining Co., Tex. Civ.App., 74 S.W.2d 524, 529, (writ ref.), wherein it is said: "We believe it is clearly deducible from all the decisions that the right of relief from assessments made in violation of the constitutional guaranty of equality of taxation, or the denial of the due process of law clause in the Fourteenth Amendment of the Federal Constitution, in failing to give the owner an opportunity to be heard on a proposed assessment, is limited to the excess over and above the amount properly assessable on an equality basis; which is the limit expressly fixed in subdivision 3 of art. 7329, Revised Civil Statutes of this state. *And, further, that the government does not lose its right to taxes justly owing on one parcel of property, by reason of the failure of its officers, either negligently or designedly, to assess other property that is likewise taxable. For the foregoing reasons, it becomes unnecessary to determine what would have been the proper manner of assessing the various kinds of intangible assets that defendant alleged were improperly omitted from the tax rolls.*" (Italics ours.) We think the above holding applicable to the issues here. Rosenburg v. Weekes, supra; Stevens v. City of El Paso, Tex.Civ.App., 81 S.W.2d 149, 152 (writ dism.), wherein it is said: "We think the taxpayer may not defend against the payment of taxes due on the ground of the bare omission from the tax rolls of certain property, such as bank deposits held in trust." Citing Altgelt v. City of San Antonio, 81 Tex. 436, 17 S.W. 75, 13 L.R.A. 383. Furthermore, even if appellants are correct in their contention that they have been wronged by the failure of the assessor-collector to assess the cash on deposit against the several owners, the wrong would work injury upon all the taxpayers in the county not owning unrendered cash and would not be an injury peculiar to appellants. In such circumstances it was held in City of San Antonio v. Strumberg, 70 Tex. 366, 7 S.W. 754, 755: "We think it a principle established by the

overwhelming weight of authority in the courts of all countries subject to the common law that no action lies to restrain an interference with a mere public right, at the suit of an individual who has not suffered or is not threatened with some damage peculiar to himself." To the same effect is Hoff v. Westhoff, Tex.Civ.App., 102 S.W.2d 293 (writ ref.).

By several points appellants assert that the trial court erred in restricting the jury to answering special issues one, two and three of the court's charge in the event said issues were answered in the negative, and in not submitting to the jury without limitation certain other special issues. The court submitted to the jury seventy-two special issues. The first three had reference to the action of the board in fixing a value on appellants' property for the years 1950, 1951 and 1952. Special Issue No. 1 is: "Do you find from the preponderance of the evidence that the commissioners' court of Harrison County, Texas, sitting as the board of equalization of Harrison County, Texas, for the year 1950, fixed the value on defendants' D. E. and R. J. Whelan property for taxable purposes for the year 1950 at a substantially higher percent of its true value than was fixed by said board on the great bulk of the property on the assessment rolls of Harrison County, Texas, for the year 1950? Answer 'Yes' or 'No'. Answer: 'No.'" Special issues two and three are identical with issue No. 1 set out above except that the inquiry was directed to the years 1951 and 1952, respectively.

Following special issue No. 3 is the following directive by the court: "If you have answered Special Issues Nos. One, Two and Three 'No', then you need not answer any other special issues;" and if the jury answers special issue No. 1 "Yes", then certain other special issues were to be answered. Special issues one, two and three were answered "no," and under the court's instructions the other sixty-nine issues were not answered. We have carefully examined the other sixty-nine issues and in our opinion they relate to eviden-

tiary matters or to matters about which there was no dispute. It is our opinion that the first three issues went to the heart of the dispute between the parties and determined the ultimate fact issue in the case. In Smith & Conklin Bros. v. Griffith, 268 S.W.2d 124, 126, our Supreme Court, in an opinion, handed down May 5, 1954, stated: "We concur in the holding of the Court of Civil Appeals that the trial court committed no error in refusing to submit to the jury the special issues requested by petitioners. The court fairly submitted the controlling issues raised by the pleadings and evidence, and the requested special issues related only to various shades of the issues submitted. Rule 279, Texas Rules of Civil Procedure, is applicable." See also same case, Tex.Civ.App., 260 S.W.2d 705. This case differs from the cited case above in one respect. In this case the issues were submitted to the jury with the directive noted above, while in the case cited the issues were requested and refused. In our opinon no error is shown by these points.

Appellants' point of error No. 76 is: "It was error for the Honorable Sam B. Hall, District Judge, to open the door and pass into the room where the jury was and have a conference with the jury out of the presence of the defendants and their lawyers." This point of error is based upon their bill of exception No. 5, which is in substance that after the jury had received the court's charge at about 6 o'clock, p. m. on Saturday, the 2nd day of May, 1953, and while the jury were deliberating upon the charge and before they had reached any agreement as to any of the answers to said issues, the sheriff informed the district judge that the jury desired to talk to him. Appellants' bill asserts further that the district judge opened the door of the jury room and went inside in the presence of the jury and closed the door behind him and asked the foreman of the jury what the jury wanted to see him about. "Whereupon the foreman of the jury stated that the jury had understood that they could not go to supper until 10:00 o'clock, p. m. on May 2, 1953, that they were hungry and

wished to go·to supper immediately, and Judge Hall then stated to the foreman of the jury in the presence and hearing of the jury for the jury to go ahead on their work and he would have the sheriff to make arrangements to take them to supper. Whereupon the said judge then opened the door and passed out of the jury room, closing the door behind him and returned to the bench." This bill of exception was approved by the trial judge with the following qualification: "That after the jury had retired, the foreman advised the bailiff they had a request to make of the judge, and the bailiff in turn communicated said information to the judge, who had theretofore left the court room. The judge returned to the court room, accompanied by the bailiff, and stepped inside the door to the room adjoining the jury room, and asked the foreman of the jury if he had a request to make of the judge. The door to the room adjoining the jury room opens into the main court room. This said door was never closed after the judge entered and judge at no time entered the jury room proper, but only through the door to the room adjoining the jury room, and the judge and the foreman were in plain view and could have been seen and heard by anyone in the courtroom. The foreman advised the judge that the jury would like to go to supper. The judge told the foreman to wait just a minute, and he would have the bailiff make arrangements to carry them immediately to their meal; whereupon, the judge stepped into the court room and told the bailiff to make arrangements at one of the eating places for the twelve jurors where they would be separate and apart from other patrons, and after he had made said arrangements to carry the jury to supper, that nothing whatever was said about the state of the jury's deliberation, or of what progress, if any, had been made, and that no proof was offered on motion as to whether the jury had or had not answered the issues submitted at the time of the complained of actions of the judge. This was the entire conversation, all of which transpired in the presence of one of the attorneys for the defendant, and one or more of the defendants, and one of the attorneys for the plaintiff. The judge and the foreman being during the entire conversation in a position where they could have been seen by everybody in the court room, including the attorneys and the parties to this litigation; and the conversation so had, could have been heard and was heard by one or more of the parties to the litigation, as well as one of the attorneys for the plaintiff; and no objection or exception was made by any of the parties, nor was there a motion to discharge the jury presented to the court before the verdict was returned in open court; and, if any error was committed by the court, same was by all parties waived. Sam B. Hall, Judge presiding." No exception was taken to the judge's qualification, and of course it becomes the bill of exception before us.

█ It is clear to us from the bill before us that the district judge never entered the jury room but merely entered the ante room which is between the jury room and the main court room where the foreman made the request that they be carried to supper, and that he, the district judge, "told the foreman to wait just a minute and I will have the bailiff make arrangements to carry them to the meal." Whereupon the judge stepped into the court room and told the bailiff to make arrangements at one of the eating places for the twelve jurors where they would be separate and apart from their patrons; and, after he had made such arrangements, to carry the jury to supper. The judge in his qualification stated further that "nothing whatever was said about the state of the jury deliberations, or of what progress, if any, had been made." It is clear from the bill before us that at the time this conversation occurred between the district judge and the foreman of the jury one of the attorneys for the defendant and one or more of the defendants and one of the attorneys for the plaintiffs were present and that the conversation between the foreman and district judge could have been heard and they could have been seen by

anybody in the court room, including the attorneys and parties to this litigation. If the facts had occurred as outlined in the bill of exception prepared by appellants before the judge's qualification was appended to it we would be inclined to hold that the trial judge committed error in entering the jury room, whatever might have been his motive. Arts. 2197 and 2198, R.C.S., Rules of Civil Procedure, rules 285, 286. Gerneth v. Galbraith, Foxworth Lumber Co., Tex.Com.App., 38 S.W.2d 775. Under Rule No. 434, T.R.C.P, we think no reversible error is shown by this bill. The recent case of Ross v. Texas Employers Ins. Ass'n, Tex.Sup., 267 S.W.2d 541, 543, is controlling of this question. We quote the following from that opinion: "The construction insisted upon by respondent would require a party seeking a new trial on the ground of a communication between a juror and counsel to show probability of harm, but would dispense with the necessity of such showing when the communication is between a judge and a juror. We find no basis for such distinction. There is not even a suggestion that the simple communication of the word 'No' to the juror probably operated to the prejudice of respondent. It is not perceived how it could have done so. That being true, we cannot concur in the holding that the judgment of the trial court should be reversed. Many cases are cited and discussed in the briefs of the respective parties. We do not feel called upon to discuss those cases in an effort to harmonize them. Ample precedent for our holding that the trial court's judgment should not be reversed is afforded by Denbow v. Standard Accident Ins. Co., 143 Tex. 455, 186 S.W.2d 236; and Watson v. Texas Indemnity Ins. Co., 147 Tex. 40, 210 S.W.2d 989. We reaffirm the rule applied in those cases, and, in so far as other cases cited by respondent may not be in harmony with that rule, they must yield to those cases as authority."

We have carefully examined the record in this case consisting of more than 2,000 pages and have studied as best we could the authorities cited by appellants and appellees. It has been a tedious record and we have given a great deal of time to investigating it and drafting this opinion. In the course of our study we have examined all the points brought forward by appellants and have concluded that they do not present error and they are respectfully overruled.

This case in our opinion, upon the findings of fact by the jury, must be affirmed, and it is accordingly so ordered.